**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE REAL TRUTH ABOUT ABORTION,
INC., f/k/a THE REAL TRUTH ABOUT
OBAMA, INC.,

    *Plaintiff-Appellant,*

    v.

FEDERAL ELECTION COMMISSION;
UNITED STATES DEPARTMENT OF
JUSTICE,

    *Defendants-Appellees.*

    No. 11-1760

DEMOCRACY 21; THE CAMPAIGN
LEGAL CENTER,

    *Amici Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, Chief District Judge.
(3:08-cv-00483-JRS)

Argued: March 21, 2012

Decided: June 12, 2012

Before NIEMEYER, GREGORY, and FLOYD,
Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Floyd joined.

---

## COUNSEL

**ARGUED:** James Bopp, Jr., THE BOPP LAW FIRM, Terre Haute, Indiana, for Appellant. Adav Noti, FEDERAL ELECTION COMMISSION, Washington, D.C., for Appellees. **ON BRIEF:** Michael Boos, LAW OFFICE OF MICHAEL BOOS, Fairfax, Virginia; Richard E. Coleson, Kaylan L. Phillips, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellant. Anthony Herman, General Counsel, David Kolker, Associate General Counsel, Harry J. Summers, Assistant General Counsel, FEDERAL ELECTION COMMISSION, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia; Tony West, Assistant Attorney General, Michael S. Raab, Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Fred Wertheimer, DEMOCRACY 21, Washington, D.C.; Donald J. Simon, SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP, Washington, D.C.; J. Gerald Hebert, Tara Malloy, Paul S. Ryan, THE CAMPAIGN LEGAL CENTER, Washington, D.C., for Amici Supporting Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

The Real Truth About Abortion, Inc. (formerly known as The Real Truth About Obama, Inc.), a Virginia non-profit corporation organized under § 527 of the Internal Revenue Code to provide "accurate and truthful information about the public policy positions of Senator Barack Obama," commenced this action against the Federal Election Commission

and the Department of Justice, contending that it was "chilled" from posting information about then-Senator Obama because of the vagueness of a Commission regulation and a Commission policy relating to whether Real Truth has to make disclosures or is a "political committee" (commonly referred to as a political action committee or PAC). Real Truth asserts that it is not subject to regulation but fears the Commission could take steps to regulate it because of the vagueness of 11 C.F.R. § 100.22(b) and the policy of the Commission to determine whether an organization is a PAC by applying the "major purpose" test on a case-by-case basis, as published at 72 Fed. Reg. 5595 (Feb. 7, 2007). It alleges that the regulation and policy are unconstitutionally broad and vague, both facially and as applied to it, in violation of the First and Fifth Amendments.

On cross-motions for summary judgment, the district court found both the regulation and the policy constitutional. And, applying the "exacting scrutiny" standard applicable to disclosure provisions, we affirm.

I

Real Truth was organized on July 24, 2008, as an "issue-adversary '527' organization" under § 527 of the Internal Revenue Code. In its IRS filing, Real Truth stated that its purpose was to provide truthful information about the public positions taken by Senator Barack Obama but that it would not "expressly advocate the election or defeat" of any political candidate or "make any contribution" to a candidate.

Within a few days of its incorporation, Real Truth commenced this action challenging three of the Commission's regulations implementing the Federal Election Campaign Act ("FECA")—11 C.F.R. § 100.22(b) (defining when a communication *expressly advocates* the election or defeat of a clearly identified candidate); 11 C.F.R. § 100.57(a) (defining contributions for certain purposes under FECA); and 11 C.F.R.

§ 114.15 (regulating the use of corporate or union funds for "electioneering communications"). In addition, Real Truth challenged the Commission's policy of determining PAC status by using a "major purpose" test on a case-by-case basis. It asserted that these regulations and the policy were unconstitutional, facially and as applied, in that they were overbroad and vague, in violation of the First and Fifth Amendments to the Constitution.

Real Truth's as-applied challenge was mounted in the context of two radio advertisements it intended to air concerning then-candidate Obama's positions on abortion. The first ad, entitled "Change," states:

> (Woman's voice): Just what is the real truth about Democrat Barack Obama's position on abortion?
>
> (Actor's voice mimicking Obama's voice) Change. Here is how I would change America . . . about abortion:
>
> • Make taxpayers pay for all 1.2 million abortions performed in America each year
>
> • Make sure that minor girls' abortions are kept secret from their parents
>
> • Make partial-birth abortion legal
>
> • Give Planned Parenthood lots more money to support abortion
>
> • Change current federal and state laws so that babies who survive abortions will die soon after they are born
>
> • Appoint more liberal Justices on the U.S. Supreme Court

One thing I would not change about America is abortion on demand, for any reason, at any time during pregnancy, as many times as a woman wants one.

(Woman's voice). Now you know the real truth about Obama's position on abortion. Is this the change you can believe in?

The second ad, entitled "Survivor," reads:

(Nurse) The abortion was supposed to kill him, but he was born alive. I couldn't bear to follow hospital policy and leave him on a cold counter to die, so I held and rocked him for 45 minutes until he took his last breath.

(Male voice) As an Illinois Democrat State Senator, Barack Obama voted three times to deny lifesaving medical treatment to living, breathing babies who survive abortions. For four years, Obama has tried to cover-up his horrendous votes by saying the bills didn't have clarifying language he favored. Obama has been lying. Illinois documents from the very committee Obama chaired show he voted against the bill that did contain the clarifying language he says he favors.

Obama's callousness in denying lifesaving treatment to tiny babies who survive abortions reveals a lack of character and compassion that should give everyone pause.

Real Truth alleged that it planned to spend over $1,000 to air these advertisements during the 60-day period immediately before the 2008 general election and that some of this money would be raised through the circulation of a fundraising letter soliciting contributions to "get the word out" regard-

ing then-Senator Obama's views on abortion. In its complaint, it expressed the fear that these expenditures might be construed as "independent expenditures" under 2 U.S.C. § 431(17) and 11 C.F.R. § 100.22(b), subjecting it to disclosure requirements and potentially making it a PAC subject to further regulation.

Real Truth sought a preliminary injunction enjoining enforcement of the challenged regulations and policy against its "intended activities" and against others similarly situated, and the district court denied Real Truth's motion. On appeal, we affirmed the district court's denial of the injunction, applying the preliminary injunction standard announced in *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365 (2008), and holding that Real Truth had not carried its burden of showing a likelihood of success, as well as showing the other requirements for a preliminary injunction. *Real Truth About Obama v. Fed. Election Comm'n*, 575 F.3d 342, 351-52 (4th Cir. 2009). Real Truth filed a petition for a writ of certiorari in the Supreme Court.

While Real Truth's petition for a writ of certiorari was pending, the Supreme Court decided *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), striking down, on First Amendment grounds, a provision of the Bipartisan Campaign Reform Act ("BCRA") banning corporations and labor unions from using their general treasury funds for electioneering communications. Based on its decision, the Court granted Real Truth's petition for certiorari, vacated this court's judgment, and remanded the case for further consideration. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 130 S. Ct. 2371 (2010).

Also in the interim, the D.C. Circuit decided *EMILY's List v. Federal Election Commission*, 581 F.3d 1 (D.C. Cir. 2009), which struck down certain aspects of 11 C.F.R. § 100.57, also the subject of Real Truth's challenge in this court, leading the

Commission to announce that it would cease enforcement of that regulation.

On remand from the Supreme Court, we reissued the portions of our original decision "stating the facts and articulating the standard for the issuance of preliminary injunctions" and remanded the remaining issues to the district court for reconsideration in light of the Supreme Court's decision in *Citizens United*. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

On remand, the parties agreed that Real Truth's challenges to 11 C.F.R. § 114.15 and 11 C.F.R. § 100.57 had become moot. And on Real Truth's remaining challenges, the district court granted summary judgment to the Commission and the Department of Justice, holding that 11 C.F.R. § 100.22(b) and the Commission's case-by-case policy for determining whether an organization was a PAC were constitutional, both facially and as applied to Real Truth. More particularly, the court found that § 100.22(b) was consistent with the "appeal-to-vote" test articulated in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), and that the Commission was entitled to use a multifactor approach on a case-by-case basis for determining PAC status because "ascertaining an organization's single major purpose is an inherently comparative task and requires consideration of the full range of an organization's activities." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 796 F. Supp. 2d 736, 746, 751 (E.D. Va. 2011).

From the district court's judgment, dated June 16, 2011, Real Truth filed this appeal.

II

At the outset, we address Real Truth's contention that, in reviewing the Commission's regulation and policy, we should apply the strict scrutiny standard. Real Truth argues that the

regulation and policy place onerous burdens on speech similar to the burdens to which the Supreme Court applied strict scrutiny in *Citizens United*, 130 S. Ct. at 898 (finding that 2 U.S.C. § 441b, restricting the amount of money a corporation could independently spend on political communication, "silenced entities whose voices the Government deems to be suspect" and therefore should be reviewed under the strict scrutiny standard).

The Commission contends instead that because the challenged regulation and policy only implicate disclosure requirements and do not restrict either campaign activities or speech, we should apply the less stringent "exacting scrutiny" standard. Under this standard, the government must demonstrate only a "substantial relation" between the disclosure requirement and "sufficiently important government interest."[1] *Citizens United*, 130 S. Ct. at 914 (internal quotation marks omitted).

Regulation 100.22(b), which Real Truth challenges as too broad and vague, implements the statutory definition of "independent expenditure," 2 U.S.C. § 431(17), which in turn determines whether a person must make disclosures as required by 2 U.S.C. § 434(c). The definition could also contribute to the determination of whether Real Truth is a PAC because it is an organization with expenditures of more than $1,000, which would impose not only disclosure requirements, but also organizational requirements. *See Speech-Now.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). Similarly, the Commission's policy for applying the "major purposes" test to organizations, which Real Truth also challenges, would also determine whether

---

[1]Real Truth appears to argue in the alternative that if exacting scrutiny does apply, then it must be a "high" version of that standard, rather than a "complaisant" one. This hybrid standard finds no support in the relevant case law, however, which has consistently applied only one type of exacting scrutiny.

Real Truth is a PAC, again implicating disclosure and organizational requirements.

Such disclosure and organizational requirements, however, are not as burdensome on speech as are limits imposed on campaign activities or limits imposed on contributions to and expenditures by campaigns. Indeed, the Supreme Court has noted that "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley v. Valeo*, 424 U.S. 1, 68 (1976); *see also Fed. Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986). Accordingly, an intermediate level of scrutiny known as "exacting scrutiny" is the appropriate standard to apply in reviewing provisions that impose disclosure requirements, such as the regulation and policy. *See Buckley*, 424 U.S. at 64; *see also Citizens United*, 130 S. Ct. at 914 (applying the exacting scrutiny standard in reviewing certain disclosure provisions of the BCRA).

Real Truth's reliance on the Court's application of strict scrutiny in *Citizens United* is misplaced. In its brief, Real Truth repeatedly notes the *Citizens United* majority's reference to "onerous" burdens on PAC speech, which would ordinarily be subject to strict scrutiny. While it is true that the Court used the word "onerous" in describing certain PAC-style obligations and restrictions, it did so in a context significantly different from the one facing Real Truth. The regulation invalidated in *Citizens United*, 2 U.S.C. § 441b, required corporations to set up a separate PAC with segregated funds before making any direct political speech. These corporate PACs were subject to several limitations on allowable contributions, including a prohibition on the acceptance of funds from the corporation itself. *See* 2 U.S.C. §§ 441a(a)(5), 441b(b)(4). The Court accordingly held that the option to create a separate corporate PAC did not alleviate the burden imposed by § 441b *on the corporation's own speech*. In contrast, the PAC disclosure requirements at issue here neither

prevent Real Truth from speaking nor "impose [a] ceiling on campaign-related activities." *Buckley*, 424 U.S. at 64. Indeed, the Court distinguished its application of the strict scrutiny standard to expenditure restrictions from the exacting scrutiny standard applicable to disclosure requirement provisions, stating:

> Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking. The Court has subjected these requirements to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.

*Citizens United*, 130 S. Ct. at 914 (internal quotation marks and citations omitted).

In sum, we conclude that even after *Citizens United*, it remains the law that provisions imposing disclosure obligations are reviewed under the intermediate scrutiny level of "exacting scrutiny." *See Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010) (applying exacting scrutiny to disclosure law relating to ballot referenda); *SpeechNow.org*, 599 F.3d at 696 (applying exacting scrutiny to PAC disclosure obligations under FECA); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 55-57 (1st Cir. 2011) (applying exacting scrutiny to PAC disclosure obligations under state law). We will accordingly review the Commission's regulation 100.22(b) and its policy for determining the major purpose of an organization under the exacting scrutiny standard.

### III

Turning to the challenge of 11 C.F.R. § 100.22, Real Truth contends that the regulation's second definition of "expressly advocating," as contained in subsection (b), is fatally broader

and more vague than the restrictions imposed on the definition of "expressly advocating" by *Buckley*, 424 U.S. at 44 & n.52, which are codified in subsection (a).

Regulation 100.22 defines "expressly advocating" as the term is used in 2 U.S.C. § 431(17), which in turn defines "independent expenditure" as an expenditure by a person "*expressly advocating* the election or defeat of a clearly identified candidate" and not made by or in coordination with a candidate or political party. (Emphasis added). Subsection (a) defines "expressly advocating" in the manner stated by the Supreme Court in *Buckley* and thus includes communications that use phrases "which in context can have no other reasonable meaning than to urge the election or defeat" of a candidate," 11 C.F.R. § 100.22(a)—words such as "vote for," "elect," "defeat," or "reject," which are often referred to as the express advocacy "magic words." *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 126 (2003) (citing *Buckley*, 424 U.S. at 44 & n.52). Subsection (b), on the other hand, defines "expressly advocating" more contextually, without using the "magic words." This subsection, which is the subject of Real Truth's challenge, provides in relevant part:

> Expressly advocating means any communication that —
>
> * * *
>
> (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because —
>
>> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

11 C.F.R. § 100.22(b).

A

Real Truth first challenges § 100.22(b) as facially overbroad. The Commission's approach of defining "expressly advocating" with the magic words of *Buckley* in subsection (a) and with their functional equivalent in subsection (b) was upheld by the Supreme Court in considering a facial overbreadth challenge to the BCRA, which included a provision defining express advocacy for purposes of electioneering communications. *See McConnell*, 540 U.S. at 189-94 (2003), *overruled in part by Citizens United*, 130 S. Ct. 876.[2] In rejecting the challenge, the *McConnell* Court noted that *Buckley*'s narrow construction of the FECA to require express advocacy was a function of the vagueness of the original statutory definition of "expenditure," not an absolute First Amendment imperative. *Id.* at 191-92. The Court accordingly held that Congress could permissibly regulate not only communications containing the "magic words" of *Buckley*, but also communications that were "the functional equivalent" of express advocacy. *Id.* at 193, 206.

Later, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), the Chief Justice's control-

---

[2]In 2001, we held that § 100.22(b) was unconstitutional because it "shift[ed] the determination of what is express advocacy away from the words in and of themselves to the unpredictability of audience interpretation." *Va. Soc'y. for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 392 (4th Cir. 2001) (internal quotation marks omitted). But this conclusion can no longer stand, in light of *McConnell* and *Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. 449 (2007).

ling opinion further elaborated on the meaning of *McConnell*'s "functional equivalent" test. The Chief Justice held that where an "ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," it could be regulated in the same manner as express advocacy. *Wisconsin Right to Life*, 551 U.S. at 470. The Chief Justice explicitly rejected the argument, raised by Justice Scalia's concurring opinion, that the only permissible test for express advocacy is a magic words test:

> Justice Scalia concludes that "[i]f a permissible test short of the magic-words test existed, *Buckley* would surely have adopted it." We are not so sure. The question in *Buckley* was how a particular statutory provision could be construed to avoid vagueness concerns, not what the constitutional standard for clarity was in the abstract, divorced from specific statutory language. *Buckley*'s intermediate step of statutory construction on the way to its constitutional holding does not dictate a constitutional test. The *Buckley* Court's "express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law.

*Id.* at 474 n.7 (internal quotation marks and citations omitted).

Contrary to Real Truth's assertions, *Citizens United* also supports the Commission's use of a functional equivalent test in defining "express advocacy." In the course of striking down FECA's spending prohibitions on certain corporate election expenditures, the *Citizens United* majority first considered whether those regulations applied to the communications at issue in the case. 130 S. Ct. at 888-96. Using *Wisconsin Right to Life*'s "functional equivalent" test, the Court concluded that one advertisement—*Hillary: The Movie*—qualified as the functional equivalent of express advocacy because it was "in essence . . . a feature-length negative advertisement that urges viewers to vote against Senator [Hillary] Clinton for Presi-

dent." *Citizens United*, 130 S. Ct. at 890. But more importantly for our decision, the Court also upheld BCRA's disclosure requirements for all electioneering communications —including those that are *not* the functional equivalent of express advocacy. *Id.* at 914-16 ("We reject Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy").[3] In this portion of the opinion, joined by eight Justices, the Court explained that because disclosure "is a less restrictive alternative to more comprehensive regulations of speech," mandatory disclosure requirements are constitutionally permissible even if ads contain no direct candidate advocacy and "only pertain to a commercial transaction." *Id.* at 915. If mandatory disclosure requirements are permissible when applied to ads that merely *mention* a federal candidate, then applying the same burden to ads that go further and are the functional equivalent of express advocacy cannot automatically be impermissible.

B

In addition to its overbreadth argument, Real Truth argues that even if express advocacy is not limited to communications using *Buckley*'s magic words, § 100.22(b) is nonetheless unconstitutionally vague. Here again, however, Real Truth's arguments run counter to an established Supreme Court prece-

---

[3]We take the registration and organizational requirements for political committees to be akin to the disclosure requirements such that, as a constitutional matter, they can be regulated regardless of whether they contain express advocacy or its functional equivalent. *See Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 54-55 & n.29 (1st Cir. 2011) (reasoning that "Maine's requirement that non-major-purpose PACs register with the Commission" was "first and foremost a disclosure provision" and that "in light of *Citizens United* . . . the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws"); *SpeechNow.org*, 599 F.3d at 694-95 (noting that after *Citizens United*, a group intending to make independent expenditures would be subject only to PAC disclosure requirements if the FEC determined that it was a PAC).

dent. The language of § 100.22(b) is consistent with the test for the "functional equivalent of express advocacy" that was adopted in *Wisconsin Right to Life*, a test that the controlling opinion specifically stated was not "impermissibly vague." *Wisconsin Right to Life*, 551 U.S. at 474 n.7. Moreover, just as the "functional equivalent" test is objective, so too is the similar test contained in § 100.22(b). *See id.* at 472 ("To the extent this evidence goes to WRTL's subjective intent, it is again irrelevant"); Express Advocacy; Independent Expenditures; Corporate and Labor Organization Expenditures, 60 Fed. Reg. 35,292, 35,295 (July 6, 1995) ("[T]he subjective intent of the speaker is not a relevant consideration").

Both standards are also restrictive, in that they limit the application of the disclosure requirements solely to those communications that, in the estimation of any reasonable person, would constitute advocacy. Although it is true that the language of § 100.22(b) does not exactly mirror the functional equivalent definition in *Wisconsin Right to Life* — e.g., § 100.22(b) uses the word "suggestive" while *Wisconsin Right to Life* used the word "susceptible"—the differences between the two tests are not meaningful. Indeed, the test in § 100.22(b) is likely narrower than the one articulated in *Wisconsin Right to Life*, since it requires a communication to have an "electoral portion" that is "unmistakable" and "unambiguous." 11 C.F.R. § 100.22(b)(1).

Real Truth relies heavily on our decision in *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), where we held North Carolina's campaign finance statute unconstitutional, to argue that § 100.22(b) is likewise unconstitutional. But our holding in *Leake* is materially distinguishable. First, we held there that the North Carolina statute was unconstitutional because the terms of the statute that defined express advocacy were "clearly susceptible to *multiple interpretations*." 525 F.3d at 283-84 (emphasis added) (internal quotation marks omitted). In contrast, § 100.22(b) applies solely to communications that "could *only* be interpreted by

a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s)" and where "[r]easonable minds *could not differ* as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action." (Emphasis added).

Second, the North Carolina provision in *Leake* regulated all electoral speech, including, potentially, issue advocacy. To resolve whether such communications could constitutionally be regulated, we articulated two requirements. First, because the regulation covered electoral speech broadly defined, we applied the requirement in *Wisconsin Right to Life*, 551 U.S. at 474 n.7, that it fulfill the statutory definition of "electioneering communication" in 2 U.S.C. § 434(f)(3)(A)(i), which, we noted, "refers to a 'clearly identified candidate' within sixty days of a general election or thirty days of a primary election." 525 F.3d at 282. Second, to narrow the alternative definition of "express advocacy" in the North Carolina statute, we relied on the functional-equivalent test developed in *Wisconsin Right to Life*, 551 U.S. at 469-70. *Id.* While the functional equivalent test that we applied to narrow the North Carolina definition of express advocacy was drawn from the functional-equivalent test in *Wisconsin Right to Life* (which itself was evaluating an electioneering communication provision), the Supreme Court has recognized use of the functional-equivalent test to define "express advocacy" wherever the term is used in the election laws. *See, e.g.*, *Citizens United*, 130 S. Ct. at 915. In contrast, in the case before us, "express advocacy" is a component of an "independent expenditure," regulated under § 432(c)(1) and § 431(17) and thus may be defined by applying the functional-equivalent test, precisely as Regulation 100.22(b) has done. Because the "electioneering communications" requirements of § 434(f)(3)(A)(i) are not statutorily relevant to "independent expenditures," we therefore need not apply those requirements applied in *Leake* when considering "express advocacy" in the context of independent expenditures.

Finally, our opinion in *Leake* emphasized the importance of BCRA's electioneering communication definition in minimizing the potential vagueness of campaign finance regulations. *Leake*, 525 F.3d at 282. Importantly, however, the North Carolina statute at issue in *Leake* imposed a variety of restrictions on campaign speech, including limits on acceptable contributions and expenditures. Again in contrast, following *Citizens United* § 100.22(b) only implements *disclosure* requirements. The Supreme Court has routinely recognized that because disclosure requirements occasion a lesser burden on speech, it is constitutionally permissible to require disclosure for a wider variety of speech than mere electioneering. *See, e.g.*, *United States v. Harriss*, 347 U.S. 612, 625 (1954) (upholding disclosure and registration requirements on lobbyists despite Congress' inability to ban lobbying itself); *First Natn'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) (observing that "[i]dentification of the source of [ballot referendum] advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected"). *Citizens United* only confirmed the breadth of Congress' power in this regard. *See Citizens United*, 130 S. Ct. at 915 ("Even if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election"); *see also Doe v. Reed*, 130 S. Ct. 2811, 2819–22 (2010) (upholding disclosure requirement for petition signatories); *Natn'l Org. for Marriage v. McKee*, 649 F.3d 34, 70 (1st Cir. 2011) (holding that state "express advocacy" definition without an "electioneering communication" limitation was not vague).

C

Real Truth advances several other reasons why it believes § 100.22(b) is impermissibly vague, but each merits only brief discussion.

*First*, Real Truth argues that the regulation applies a balancing test similar to one in 11 C.F.R. § 114.15 (regulating

corporate and labor organization funds expended for certain electioneering communications), which was invalidated in *Citizens United*. The two provisions are, however, substantially distinguishable. The *Citizens United* Court described § 114.15 as a "two-part, 11-factor balancing test," making it significantly more complicated on its face than § 100.22(b). *Citizens United*, 130 S. Ct. at 895. The Court also emphasized the censorious nature of § 114.15, which, given its complexity, required that regulated entities "either refrain from speaking or ask the [Commission] to issue an advisory opinion approving of the political speech in question." *Id.* In contrast, § 100.22(b) *does not restrain speech*; it only implicates *the requirement for disclosing* specified information. The Supreme Court's criticism of § 114.15 can hardly cast doubt on § 100.22(b).

*Second*, Real Truth asserts that because § 100.22 considers "proximity to the election" as a factor, it is inconsistent with *Wisconsin Right to Life*. Again, we disagree. *Wisconsin Right to Life* simply held that the timing of speech cannot be used as a proxy for a speaker's intent. 551 U.S. at 472 ("To the extent th[e] evidence [regarding the timing of WRTL's ads] goes to WRTL's subjective intent, it is again irrelevant"). As discussed above, however, subjective intent is already an impermissible consideration under both tests. Moreover, as *Wisconsin Right to Life* noted, by virtue of their time-sensitive statutory definition, "*[e]very* ad covered by [the electioneering communication regulations] will . . . air just before a primary or general election." *Id.* So while considering timing with respect to electioneering communications would prove redundant, a limited reference to whether, for example, an ad airs in an election year, would actually help limit the number of communications that are considered independent expenditures.

*Third*, Real Truth suggests that the entirety of § 100.22 is vague because the regulation contains certain words, such as "suggestive" and "electoral portion," which are facially vague.

Regardless, however, of whether words might be insufficiently clear when standing alone, we cannot conclude that they render the statute vague when considered in their context. The complete phrase in which these words appear— "[t]he electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning"—is essentially a more stringent version of the relevant language from *Wisconsin Right to Life*'s "functional equivalent" test, which requires that a communication be "susceptible of no [other] reasonable interpretation." If, as the Supreme Court has held, the test in *Wisconsin Right to Life* is not vague, then neither is § 100.22(b).

*Fourth* and finally, Real Truth argues that § 100.22(b) is vague because the district court and the Commission disagreed as to whether Real Truth's "Change" ad was the functional equivalent of express advocacy. But this fact proves little because cases that fall close to the line will inevitably arise when applying § 100.22(b). This kind of difficulty is simply inherent in any kind of standards-based test. *Cf. United States v. Williams*, 553 U.S. 285, 306 (2008) ("Close cases can be imagined under virtually any statute. The problem that poses is [not] addressed . . . by the doctrine of vagueness"); *United States v. Wurzbach*, 280 U.S. 396, 399 (1930) (holding that the Federal Corrupt Practices Act was not facially vague because "[w]herever the law draws a line there will be cases very near each other on opposite sides"). If anything, the disagreement to which Real Truth alludes confirms the Commission's judgment that "Change" does not meet the requirements of § 100.22(b), since both the Commission and the district court are rational minds and § 100.22 applies only *when reasonable people could not disagree* about a communication's status.

At bottom, we conclude that § 100.22(b) is constitutional, facially and as applied to Real Truth's intended advertisements. The regulation is consistent with the test developed in *Wisconsin Right to Life* and is not unduly vague.

IV

Finally, Real Truth contends that the Commission's policy for applying the "major purpose" test in determining whether an organization is a PAC is unconstitutional because it "weigh[s] various vague and overbroad factors with undisclosed weight." It maintains that the only permissible methods of analyzing PAC status are (1) examining an organization's expenditures to see if campaign-related speech amounts to 50% of all expenditures; or (2) reviewing "the organization's central purpose revealed by its organic documents."[4]

The FECA defines a "political committee" or PAC, as we have called it, as any "committee, club, association, or other group of persons" that makes more than $1,000 in political expenditures or receives more than $1,000 in contributions during a calendar year. 2 U.S.C. § 431(4)(a). The terms "expenditures" and "contributions" are in turn defined to encompass any spending or fundraising "for the purpose of influencing any election for Federal office." *Id.* §§ 431(8)(A)(i), 431(9)(A)(i).

In *Buckley*, the Supreme Court concluded that defining PACs "only in terms of amounts of annual 'contributions' and 'expenditures'" might produce vagueness issues. Accordingly,

---

[4]The Commission challenges our right to review this issue, arguing that the 2007 Federal Register Notice announcing its decision not to adopt a regulatory definition of "political committee" is not a "final agency action" under the Administrative Procedure Act, and therefore not subject to judicial review. *See Bennett v. Spear*, 520 U.S. 154 (1997). But we do not take Real Truth's challenge as one limited to the 2007 Notice itself. Rather, Real Truth cites the 2007 Notice and the 2004 Notice of Proposed Rulemaking because those documents explain the Commission's PAC-status enforcement policy. What Real Truth objects to is the Commission's decision to adopt a multi-factored standard for determining when an organization qualifies for PAC status. That choice is undoubtedly a "consummation of the agency's decisionmaking process" that can determine a party's rights and obligations, namely, the obligations of PAC status. *Id.* at 177-78 (internal quotation marks omitted).

the Court limited the applicability of FECA's PAC require-
ments to organizations controlled by a candidate or whose
"major purpose" is the nomination or election of candidates.
*Buckley*, 424 U.S. at 79. An organization that is not controlled
by a candidate must therefore register as a PAC if its contri-
butions or expenditures exceed $1,000 and its "major pur-
pose" is the nomination or election of a federal candidate.

Following *Buckle*y, the Commission adopted a policy of
determining PAC status on a case-by-case basis. *See* Political
Committee Status, 72 Fed. Reg. 5595, 5596–97 (Feb. 7, 2007)
(the "2007 Notice"). Under this approach, the Commission
first considers a group's political activities, such as spending
on a particular electoral or issue-advocacy campaign, *see id.*
at 5601, and then it evaluates an organization's "major
purpose," as revealed by that group's public statements, fun-
draising appeals, government filings, and organizational docu-
ments, *see id.*

In March 2004, the Commission published a Notice of Pro-
posed Rulemaking that, among other things, requested com-
ments on whether the Commission should adopt a regulatory
definition of "political committee" or PAC. *See* Political
Committee Status, 69 Fed. Reg. 11,736, 11,743–49 (Mar. 11,
2004). After receiving public comments and holding several
hearings, the Commission issued a Final Rule stating that it
would not alter its existing method of determining PAC sta-
tus. *See* Political Committee Status, Definition of Contribu-
tion, and Allocation for Separate Segregated Funds and
Nonconnected Committees, 69 Fed. Reg. 68,056, 68,056-63
(Nov. 23, 2004).

When the Commission's decision not to adopt a statutory
definition of a PAC was challenged in court, the court
rejected the plaintiffs' request to require the Commission to
commence a new rulemaking. It found, however, that the
Commission had "failed to present a reasoned explanation for
its decision" to regulate § 527 organizations through case-by-

case adjudication rather than a rulemaking. *See Shays v. Fed. Election Comm'n*, 424 F. Supp. 2d 100, 117 (D.D.C. 2006) ("*Shays I*"). Therefore, it remanded the case to the Commission "to explain its decision or institute a new rulemaking." *Id.* at 116–17.

The Commission responded in February 2007 by publishing in the Federal Register a "Supplemental Explanation and Justification," as part of the 2007 Notice, where it gave notice of its decision not to promulgate a new definition of "political committee" and discussed the reasons it would not do so but instead would continue to apply a case-by-case approach. 72 Fed. Reg. 5596–97. The Commission stated that "[a]pplying the major purpose doctrine . . . requires the flexibility of a case-by-case analysis of an organization's conduct that is incompatible with a one-size-fits-all rule." *Id.* at 5601. The 2007 Notice also "explain[ed] the framework for establishing political committee status under FECA" and "discusse[d] several recently resolved administrative matters that provide considerable guidance to all organizations regarding . . . political committee status." *Id.* at 5595-96.

Although *Buckley* did create the major purpose test, it did not mandate a particular methodology for determining an organization's major purpose. And thus the Commission was free to administer FECA political committee regulations either through categorical rules or through individualized adjudications. *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual . . . litigation is one that lies primarily in the informed discretion of the administrative agency").

We conclude that the Commission had good and legal reasons for taking the approach it did. The determination of whether the election or defeat of federal candidates for office is *the* major purpose of an organization, and not simply *a* major purpose, is inherently a comparative task, and in most instances it will require weighing the importance of some of

a group's activities against others. As the district court noted in upholding the case-by-case approach in *Shays v. Federal Election Commission*, 511 F. Supp. 2d 19 (D.D.C. 2007) ("*Shays II*"),

> an organization . . . may engage in many non-electoral activities so that determining its major purpose requires a very close examination of various activities and statements. Or an organization may be engaging in substantial amounts of both federal and non-federal electoral activity, again requiring a detailed analysis of its various activities.

511 F. Supp. 2d at 31.

The necessity of a contextual inquiry is supported by judicial decisions applying the major purpose test, which have used the same fact-intensive analysis that the Commission has adopted. *See, e.g.*, *Fed. Election Comm'n v. Malenick*, 310 F. Supp. 2d 230, 234–37 (D.D.C. 2004), *rev'd in part*, No. Civ. A. 02-1237 (JR) 2005 WL 588222 (D.D.C. Mar. 7, 2005); *Fed. Election Comm'n v. GOPAC, Inc.*, 917 F. Supp. 851, 859, 864–66 (D.D.C. 1996); *see also Shays II*, 511 F. Supp. 2d at 29–31 (holding that the Commission's choice to regulate § 527 groups by determining whether they qualified as political action committees on a case-by-case basis was neither arbitrary nor capricious).

Real Truth's argument that the major purpose test requires a bright-line, two-factor test relies heavily on *Massachusetts Citizens for Life*, 479 U.S. at 263, and *Leake*, 525 F.3d at 289. But neither of these cases can bear the weight Real Truth ascribes to it. In *Massachusetts Citizens for Life*, the Court suggested in dicta (inasmuch as Massachusetts Citizens for Life was not a PAC) that an organization's independent spending could "become so extensive that the organization's major purpose may be regarded as campaign activity." *Massachusetts Citizens for Life*, 479 U.S. at 262. This statement

indicates that the amount of independent spending is a relevant factor in determining PAC status, but it does not imply that the Commission may *only* consider spending. Indeed, the Court in *Massachusetts Citizens for Life* implicitly endorsed the Commission's approach when it examined the entire record to conclude that the plaintiff did not satisfy the "major purpose" test.

And Real Truth's reliance on *Leake* is similarly misplaced. In *Leake*, we described the major purpose test as follows:

> Basically, if an organization explicitly states, in its bylaws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money on supporting or opposing candidates, that organization is under "fair warning" that it may fall within the ambit of *Buckley*'s test.

525 F.3d at 289. Like the dicta in *Massachusetts Citizens for Life*, this statement suggests that expenditure ratios and organizational documents are important considerations when determining whether an organization qualifies as a PAC. The case does not, however, make consideration of any other factors improper. In fact, we specifically declined to determine whether the very same bright-line, two-factor test urged by Real Truth was the only permissible manner in which to apply *Buckley*'s major purpose requirement. *Id.* at 289 n.6.

Thus, although cases since *Buckley* have indicated that certain facts may be particularly relevant when assessing an organization's major purpose, those decisions do not foreclose the Commission from using a more comprehensive methodology.

Despite Real Truth's protestations, we see little risk that the Commission's existing major purpose test will chill political expression.[5] In the First Amendment context, a statute may be

---

[5]Real Truth does not assert that the major purpose test is unconstitutional as applied to it. Nor could it, since the Commission has never

found overbroad if a "substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)). Real Truth has failed to explain why the Commission's test would prevent any party from speaking, especially in view of the fact that the application of the test to find that an organization is a PAC would subject the organization only to "minimal" reporting and organizational obligations. *See SpeechNow*, 599 F.3d at 697-98.

We should note that the class of speakers who would be subject to FECA's PAC regulations would be significantly smaller than the totality of groups that speak on political subjects. In most cases the Commission would only begin to consider a group's "major purpose" after confirming that the group had either made $1,000 in expenditures or received more than $1,000 in contributions. *See* 72 Fed. Reg. at 5603–04. The expenditure or contribution threshold means that some groups whose "major purpose" was indisputably the nomination or election of federal candidates would not be designated PACs. *Cf. Shays II*, 511 F. Supp. 2d at 26–27 (criticizing the Commission's method for determining PAC status as too narrow).

And even if an organization were to find itself subject to a major-purpose investigation, that investigation would not necessarily be an intrusive one. Much of the information the Commission would consider would already be available in that organization's government filings or public statements. If additional information were required, the Commission's Federal Register notices, advisory opinions, and other policy doc-

---

claimed that Real Truth is a PAC. Real Truth also does not specifically identify any instances in which, in its opinion, the Commission incorrectly categorized an organization as a PAC.

uments would provide the organization with ample guidance as to the criteria the Commission might consider. In this respect, the Commission's test is again distinguishable from the test we struck down in *Leake*, which "provide[d] absolutely no direction as to how North Carolina determines an organization's 'major purpose'" and was implemented using "unannounced criteria." 525 F.3d at 289–90.

At bottom, we conclude that the Commission, in its policy, adopted a sensible approach to determining whether an organization qualifies for PAC status. And more importantly the Commission's multi-factor major-purpose test is consistent with Supreme Court precedent and does not unlawfully deter protected speech. Accordingly, we find the policy constitutional.

*AFFIRMED*