**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CENTER FOR INDIVIDUAL FREEDOM,
INCORPORATED; WEST
VIRGINIANS FOR LIFE,
INCORPORATED; ZANE LAWHORN,

        *Plaintiffs-Appellees,*

        v.

NATALIE H. TENNANT, Secretary of
the State of West Virginia and as
a member of the West Virginia
State Election Commission; GARY
COLLIAS; WILLIAM N. RENZELLI;
ROBERT RUPP; CINDY SMITH, in
their official capacities as
members of the West Virginia
State Election Commission; SCOTT
ASH, Prosecuting Attorney for
Mercer County, as a representative
of the class of Prosecuting
Attorneys in the State of West
Virginia,

        *Defendants-Appellants,*

        and

No. 11-1952

WEST VIRGINIA EDUCATION
ASSOCIATION; WEST VIRGINIA
AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS; BOB
BASTRESS; MARGARET L. WORKMAN;
MENIS ELBERT KETCHUM,

      *Intervenors/Defendants.*

BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW; OHIO
VALLEY ENVIRONMENTAL COALITION;
WEST VIRGINIA CITIZENS FOR CLEAN
ELECTIONS; LEAGUE OF WOMEN
VOTERS OF WEST VIRGINIA; WEST
VIRGINIA CITIZEN ACTION GROUP,

      *Amici Supporting Appellants.*

CENTER FOR INDIVIDUAL FREEDOM,
INCORPORATED,

      *Plaintiff-Appellant,*

      and

WEST VIRGINIANS FOR LIFE,
INCORPORATED; ZANE LAWHORN,

      *Plaintiffs,*

      v.

No. 11-1993

NATALIE H. TENNANT, Secretary of the State of West Virginia and as a member of the West Virginia State Election Commission; GARY COLLIAS; WILLIAM N. RENZELLI; ROBERT RUPP; CINDY SMITH, in their official capacities as members of the West Virginia State Election Commission; SCOTT ASH, Prosecuting Attorney for Mercer County, as a representative of the class of Prosecuting Attorneys in the State of West Virginia,

*Defendants-Appellees,*

and

WEST VIRGINIA EDUCATION ASSOCIATION; WEST VIRGINIA AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; BOB BASTRESS; MARGARET L. WORKMAN; MENIS ELBERT KETCHUM,

*Intervenors/Defendants.*

BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW; OHIO
VALLEY ENVIRONMENTAL COALITION;
WEST VIRGINIA CITIZENS FOR CLEAN
ELECTIONS; LEAGUE OF WOMEN
VOTERS OF WEST VIRGINIA; WEST
VIRGINIA CITIZEN ACTION GROUP,

Amici Supporting Appellees.

Appeals from the United States District Court
for the Southern District of West Virginia, at Bluefield.
Thomas E. Johnston, District Judge.
(1:08-cv-00190; 1:08-cv-01133)

Argued: October 23, 2012

Decided: January 18, 2013

Before MOTZ, DUNCAN, and FLOYD, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Floyd wrote the opinion, in which Judge Motz and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Anthony J. Majestro, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Natalie H. Tennant, Gary Collias, William N. Renzelli, Robert Rupp, Cindy Smith, and Scott Ash. James Bopp, Jr., THE BOPP LAW FIRM, Terre Haute, Indiana; Thomas W. Kirby, WILEY REIN, LLP, Washington, D.C., for Center for Individual

Freedom, Incorporated, West Virginians for Life, Incorporated, and Zane Lawhorn. **ON BRIEF:** Silas B. Taylor, Senior Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Natalie H. Tennant, Gary Collias, William N. Renzelli, Robert Rupp, and Cindy Smith; Nicholas S. Preservati, Charleston, West Virginia, for Scott Ash. Andrew G. Woodson, WILEY REIN, LLP, Washington, D.C., for Center for Individual Freedom, Incorporated. Randy Elf, JAMES MADISON CENTER FOR FREE SPEECH, Terre Haute, Indiana, for West Virginians for Life, Incorporated, and Zane Lawhorn. David S. Turetsky, Mark Walsh, J. Porter Wiseman, DEWEY & LEBOEUF LLP, Washington, D.C.; Mark Ladov, Mimi Marziani, Adam Skaggs, David Earley, THE BRENNAN CENTER FOR JUSTICE AT NYU, New York, New York, for Amici Curiae.

---

**OPINION**

FLOYD, Circuit Judge:

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. In its now-famous *Citizens United v. FEC* decision, the Supreme Court recognized that the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." 130 S. Ct. 876, 898 (2010) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)) (internal quotation marks omitted). However, at the same time, the Supreme Court has emphasized the importance of providing the electorate with information about the source of campaign spending—even when these disclosure requirements burden election-related speech. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 196 (2003), *overruled on other grounds by Citizens United*, 130 S. Ct. 876; *Buckley v. Valeo*, 424 U.S. 1, 64, 66-67 (1976) (per curiam). In this case,

we confront the delicate balance between protecting political speech and informing the electorate about the organizations that bankroll modern elections. Specifically, we consider whether West Virginia's campaign-finance reporting and disclaimer requirements can survive constitutional scrutiny.

Appellee and Cross-Appellant Center for Individual Freedom (CFIF) and Appellee West Virginians for Life (WVFL) are § 501(c)(4) organizations that engage in election-related speech. These organizations and Zane Lawhorn[1]—a West Virginia resident who wishes to receive WVFL's communications—brought suit against West Virginia's secretary of state, members of the West Virginia State Election Commission, and a class of West Virginia's prosecuting attorneys, alleging that West Virginia's campaign finance statutes were constitutionally impermissible. The district court struck down some of the provisions and upheld other portions of the statutory scheme, and both West Virginia[2] and CFIF appealed. We now affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

A.

Following the 2004 election, the West Virginia legislature acted to strengthen the state's election statutes due to an "explosion of expenditures by groups independent of candidates." These new laws required organizations to file reports with the West Virginia secretary of state and include disclaimers on their communications when they made certain election-related expenditures and engaged in campaign-related speech. CFIF and WVFL filed separate challenges to the new laws, alleging

---

[1]For purposes of this opinion, we refer to WVFL and Lawhorn collectively as "WVFL."

[2]We refer to this case's Defendants, Appellants, and Cross-Appellees as "West Virginia" for ease of reference.

that they feared prosecution under the statutes because they disseminated communications that fell within the laws' scope but were unwilling to disclose the sources of their contributions.

CFIF's mission "is to protect and defend individual freedoms and individual rights guaranteed by the U.S. Constitution." CFIF plans to use broadcast media, print media, and telephone banks "to speak to the public in the Southern District of West Virginia on matters of litigation reform and related justice issues, including criminal law enforcement and sentencing, legal reform, and judicial decision-making." To this end, CFIF will "refer to West Virginia candidates to illustrate its points and ask members of the public to contact the candidates and petition them to take or maintain certain positions." WVFL, in turn, aims "to present information upon which individuals and the general public may make informed decisions about such topics as fetal development, abortion and its alternatives, and euthanasia." To further this purpose, "WVFL has distributed candidate-comparison fliers, placed candidate comparisons in ads for newspaper and television as well as on the Internet, and issued petitions and mailings." In sum, both CFIF and WVFL engage in election-related speech to promote their organizational goals.

## B.

CFIF filed its initial complaint against Betty Ireland[3] —West Virginia's secretary of state—and a class of West Virginia's prosecuting attorneys on March 21, 2008, challenging West Virginia's reporting and disclaimer requirements for (1) expenses associated with "advocating or opposing the nomination, election or defeat of any candidate;" (2) expenditures "in support of or opposition to the nomination or elec-

---

[3]In 2009, Appellant and Cross-Appellee Natalie Tennant replaced former Defendant Betty Ireland as West Virginia's secretary of state. The district court substituted Tennant for Ireland on January 19, 2009.

tion" of a candidate; and (3) "electioneering communication." By order, the district court permitted the West Virginia Education Association (WVEA), the West Virginia American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), Robert M. Bastress, Jr., Margaret L. Workman, and Menis E. Ketchum to intervene as defendants. The West Virginia AFL-CIO and WVEA intervened due to their "concrete interests, distinct from those of other parties, in upholding the West Virginia campaign finance provisions at issue." Bastress, Workman, and Ketchum were each seeking nomination for election to a seat on the West Virginia Supreme Court of Appeals and alleged that CFIF had targeted them through its communications.

On April 22, 2008, the district court entered an injunction preventing West Virginia from applying the campaign finance statutes to "anything other than communications that expressly advocate the election or defeat of a clearly identified candidate" and restricting the definition of "electioneering communication" to certain broadcast media. *Ctr. for Individual Freedom, Inc. v. Ireland* (*CFIF I*), No. 1:08-00190, 2008 WL 1837324, at *7 (S.D. W. Va. Apr. 22, 2008). Shortly thereafter, the West Virginia legislature amended the code sections that were the subject of the injunction, and West Virginia moved to dissolve the injunction, arguing that the amendments rendered it moot. The district court granted West Virginia's motion and directed CFIF to seek a new injunction based on the amended language.

On September 30, 2008, WVFL filed its verified complaint and motion for a preliminary injunction raising challenges to the amended statutory provisions. Specifically, WVFL challenged the statutory scheme's reporting requirements and its definitions of "electioneering communication" and "expressly advocating." Less than a week later, CFIF filed a motion for a preliminary injunction and challenged many of the same provisions, and the district court consolidated the two cases: *Center for Individual Freedom, Inc. v. Ireland*, No. 1:08-cv-

00190, and *West Virginians for Life, Inc. v. Ireland*, No. 1:08-cv-0113. The district court issued its memorandum opinion and order regarding the preliminary injunction motions on October 17, 2008, and released its amended opinion and order on February 12, 2009. Notably, the district court held that (1) West Virginia's definition of "expressly advocating" was vague and (2) its definition of "electioneering communication" was overbroad because it applied to more media than the definition that appears in the federal Bipartisan Campaign Reform Act (BCRA), which—unlike West Virginia's then-existing definition—includes only broadcast media. The court therefore granted CFIF's and WVFL's requests for preliminary injunctions with respect to those provisions. *See Ctr. for Individual Freedom, Inc. v. Ireland* (*CFIF II*), 613 F. Supp. 2d 777, 790-92, 800-01 (S.D. W. Va. 2009).

After the district court ruled on their preliminary injunction motions, both CFIF and WVFL moved for summary judgment. However, due to pending petitions for rehearing en banc and a writ of certiorari in *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), the district court granted WVFL's motion to stay the case on September 16, 2009. The Supreme Court ultimately granted the certiorari petition, vacated this Court's decision in *Real Truth*, and remanded the case in light of *Citizens United*, *see The Real Truth About Obama, Inc. v. FEC*, 130 S. Ct. 2371 (2010), causing the district court to dissolve the stay on May 26, 2010.

## C.

In 2010, West Virginia's legislature amended the provisions at issue in this case for a second time. The amendments went into effect on June 11, 2010, and concerned West Virginia Code section 3-8-1, which states the purposes of the law; section 3-8-1a, which includes the definitions of "electioneering communication" and "expressly advocating"; and section 3-8-2, which lays out the requirements for reporting

election-related spending that is not coordinated with a candidate or political party, also known as independent expenditures. Presumably to more closely comport with the October 2008 preliminary injunction order,[4] the West Virginia legislature removed direct mailings, telephone banks, and billboard advertising from the "electioneering communication" definition. *See* W. Va. Code § 3-8-1a(11)(A). In relevant part, the latest version of the statute requires individuals and organizations to (1) file reports with West Virginia's secretary of state if they make independent expenditures of a certain amount, *id.* § 3-8-2(b)(1), (c)(1)-(2), (d)(1)-(2); (2) file reports with West Virginia's secretary of state if they engage in electioneering communication, which "means any paid communication made by broadcast, cable or satellite signal, or published in any newspaper, magazine or other periodical," *id.* §§ 3-8-1a(11)(A), 3-9-2b(a)(1)-(2); and (3) include disclaimers on electioneering communications and communications financed by independent expenditures identifying the individuals making the expenditure and indicating that a candidate or candidate's committee did not authorize the communication, *id.* §§ 3-8-2(2), 3-8-2b(e).

CFIF filed a renewed motion for summary judgment on September 14, 2010, and WVFL filed a second motion for summary judgment on the same day. Both organizations contended that the amendments failed to remedy the constitutional defects in the campaign finance regime. On August 3, 2011, the district court granted in part and denied in part their motions for summary judgment. *See Ctr. for Individual Freedom, Inc. v. Tennant* (*CFIF III*), 849 F. Supp. 2d 659 (S.D. W. Va. 2011). In its opinion, the district court came to the following pertinent conclusions:

---

[4]The West Virginia legislature provides little, if any, formal legislative history. *See Ctr. for Individual Freedom v. Tennant*, 849 F. Supp. 2d 659, 668 n.6 (S.D. W. Va. 2011); *Appalachian Power Co. v. Sadler*, 314 F. Supp. 2d 639, 641 n.2 (S.D. W. Va. 2004).

1. The district court held that subsection (C) of the statute's definition of "expressly advocating"—which defines "expressly advocating" as "any communication that . . . [i]s susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," W. Va. Code § 3-8-1a(12)(C)—was fatally vague. The court therefore severed subsection (C) from the remainder of the definition. *CFIF III*, 849 F. Supp. 2d at 685-87.

2. The district court held that West Virginia's inclusion of periodicals in its definition of "electioneering communication" rendered the definition overbroad. *Id.* at 697. In reaching its conclusion, the district court emphasized the West Virginia legislature's failure to develop a record or make findings that supported its inclusion of print media. *See id.* at 694-97. Consequently, the court severed West Virginia Code section 3-8-1a(11)'s reference to materials "published in any newspaper, magazine or other periodical." *Id.* at 697.

3. The court determined that various exemptions to the "electioneering communication" definition were constitutional. First, the court upheld a "grassroots lobbying" exemption, which provides that "electioneering communication" does not include "communication[s] made while the Legislature is in session which, incidental to promoting or opposing a specific piece of legislation pending before the Legislature, urges the audience to communicate with a member or members of the Legislature concerning that piece of legislation." W. Va. Code § 3-8-1a(11)(B)(v); *CFIF III*, 849 F. Supp. 2d at 700-03. Second, the court declined to address the merits of CFIF's challenge to an exemption for "bona fide news account[s]," which provides:

   (i) A news story, commentary or editorial disseminated through the facilities of any broadcast, cable or satellite television or radio station, newspaper, magazine or other periodical publication not owned or

controlled by a political party, political committee or candidate: *Provided,* That a news story disseminated through a medium owned or controlled by a political party, political committee or candidate is neverthe-less exempt if the news is:

(I) A bona fide news account communi-cated in a publication of general circulation or through a licensed broadcasting facili-ty[.]

W. Va. Code § 3-8-1a(11)(B)(i). The court determined that CFIF lacked standing to challenge this exemption because CFIF failed to demonstrate that it intended to publish news stories or functioned as a "political party, political committee or candidate." *CFIF III*, 849 F. Supp. 2d at 707. Third, the court upheld a provision that exempts communications by § 501(c)(3) organizations because federal law prohibits these groups from engaging in express advocacy. *Id.* at 707-09.

4. The district court determined that the statutory scheme's twenty-four-hour and forty-eight-hour reporting and dis-claimer requirements could survive exacting scrutiny. *CFIF III*, 849 F. Supp. 2d at 711-15.

5. However, the district court concluded that the reporting requirement for electioneering communications was ambiguous insofar as it mandated disclosure of the "names and addresses of any contributors who contributed a total of more than one thousand dollars between the first day of the preceding calendar year and the disclosure date and *whose contributions were used to pay for electioneering communications.*" W. Va. Code § 3-8-2b(b)(5) (emphasis added); *CFIF III*, 849 F. Supp. 2d at 717-19. To cure the ambiguity of the emphasized portion, the court restricted the reporting requirement to "individuals who respond to a solicitation for electioneering communications or ear-mark their contributions for such use." *Id.* at 719.

The district court chose not to vacate the April 2008 and October 2008 injunctions due to the legislature's amendments, which would have allowed West Virginia to prosecute groups for violating the enjoined portions of the statutory scheme while the injunctions were in effect. Instead, the district court "dissolve[ed]" the injunctions, thereby prohibiting these prosecutions. *CFIF III*, 849 F. Supp. 2d at 719-20.

D.

West Virginia now appeals the district court's determination that subsection (C) of the statute's "expressly advocating" definition was vague, its decision to strike periodicals from the "electioneering communication" definition, and its decision to apply an "earmarked funds" limiting construction to the reporting requirement for electioneering communications. Furthermore, West Virginia contends that the district court should have vacated the earlier injunctions as moot rather than barring prosecutions for violations that occurred when the injunctions were in effect. CFIF cross-appeals the court's conclusion that it lacked standing to challenge the "bona fide news account" exemption and its determinations that the "grassroots lobbying" and § 501(c)(3) exemptions were constitutional. Although WVFL did not file a notice of appeal in this case, it contends that, if we uphold the statutory scheme's "electioneering communication" and "expressly advocating" definitions, we should strike down the reporting and disclaimer requirements due to these provisions' alleged vagueness and overbreadth. We have jurisdiction pursuant to 28 U.S.C. § 1291. The WVEA, the West Virginia AFL-CIO, Bastress, Workman, and Ketchum are not parties to this appeal.

We affirm the district court's decisions to (1) strike "newspaper, magazine or other periodical" from West Virginia's "electioneering communication" definition; (2) uphold the "electioneering communication" definition's exemption for grassroots lobbying; (3) decline to consider the merits of

CFIF's challenge to the bona fide news accounts exemption because the organization lacks standing; and (4) prohibit prosecutions for violations that occurred while the earlier injunctions were in effect. However, we reverse the district court's decision with respect to (1) its conclusion that subsection (C) of the "expressly advocating" definition is unconstitutional; (2) its choice to uphold the "electioneering communication" definition's § 501(c)(3) exemption; and (3) its application of an "earmarked funds" limiting construction to the reporting requirement for electioneering communications. Because WVFL did not file a notice of appeal in this case, we cannot consider its challenge to the district court's finding that the statutory scheme's twenty-four- and forty-eight-hour reporting requirements are constitutional. We consequently affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## II.

A court considering a summary judgment motion must view the facts in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). We review de novo both the district court's decision to grant in part and deny in part CFIF's and WVFL's motions for summary judgment and its conclusions of law. *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 724 (4th Cir. 2000); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). With respect to the district court's decision to prohibit prosecutions for violations that occurred while the April 2008 and October 2008 injunctions were in place, we review for abuse of discretion. *See Conservation Council of N.C. v. Costanzo*, 528 F.2d 250, 251-52 (4th Cir. 1975).

## III.

First, we consider West Virginia's contention that the district court erred in concluding that subsection (C) of the statute's definition of "expressly advocating" is

unconstitutionally vague. Subsection (C) provides that "expressly advocating" includes "any communication that . . . [i]s susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." W. Va. Code § 3-8-1a(12)(C). The statutory scheme incorporates the phrase "expressly advocating" into the definition of "independent expenditure" and does not include the phrase elsewhere. Pursuant to the statute, an "independent expenditure" is "an expenditure . . . [e]xpressly advocating the election or defeat of a clearly identified candidate" and "[t]hat is not made in concert or cooperation with or at the request or suggestion of such candidate, his or her agents, the candidates authorized political committee or a political party committee or its agents." W. Va. Code § 3-8-1a(15).

Relying on *FEC v. Wisconsin Right to Life, Inc.*, (*WRTL II*), 551 U.S. 449 (2007), the district court determined that the Supreme Court endorsed "appeal to vote" tests—such as subsection (C)—only within the confines of the BCRA's "electioneering communication" definition. *CFIF III*, 849 F. Supp. 2d at 686-97. In other words, the district court held that, pursuant to *WRTL II*, provisions such as subsection (C) can survive vagueness challenges only when they reach communications that (1) are disseminated via cable, broadcast, or satellite; (2) refer to a clearly identified candidate; (3) are disseminated within certain time periods before an election; and (4) are directed at the relevant electorate. The district court declined to fully address CFIF's and WVFL's overbreadth challenges because it invalidated subsection (C) on vagueness grounds. *Id.* at 685. For the reasons discussed below, we find that the district court erred in holding that subsection (C) is vague and decline to strike down the provision on overbreadth grounds.

Statutory provisions are unconstitutionally vague if they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a statute "is capa-

ble of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002). Due to this Court's recent decision in *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), CFIF's and WVFL's vagueness arguments cannot succeed. In *Real Truth*, this Court held that the federal definition of "expressly advocating" is not unconstitutionally vague. *Id.* at 555. Per the federal definition—which appears in 11 C.F.R. § 100.22(b)—"expressly advocating" is a communication that,

> [w]hen taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—
>
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
>
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

*Real Truth* held that the differences between § 100.22(b) and the *WRTL II* "functional equivalent" test—which specifies that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *WRTL II*, 551 U.S. at 470-71—were "not meaningful." *Real Truth*, 681 F.3d at 552. Because the *WRTL II* test and the portion of the West Virginia definition at issue here are identical, *Real Truth*'s holding

applies to this case. We therefore hold that subsection (C) is not unconstitutionally vague.

Although CFIF and WVFL argue that this Court's decision in *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), necessitates finding that subsection (C) is vague, the situation at issue in *Leake* is distinguishable from the circumstances in this case for the same reasons this Court distinguished it in *Real Truth*. Notably, like the provision before this Court in *Real Truth*, the "expressly advocating" definition under review in this case is a component of West Virginia's "independent expenditure" definition. W. Va. Code § 3-8-1a(15); *Real Truth*, 681 F.3d at 553. The *Leake* panel elected to cabin the North Carolina provision at issue in that case within the confines of the statute's "electioneering communication" definition due to concerns about the provision's broad applicability. *Leake*, 525 F.3d at 283-84. Those concerns are not at play in this case because, as previously noted, the West Virginia legislature embedded the "expressly advocating" term within the "independent expenditure" definition, thereby limiting its applicability. Consequently, *Leake* does not alter our conclusion that *Real Truth* compels us to reverse the district court's determination that subsection (C) is unconstitutionally vague.

Because the district court erred in invalidating subsection (C) on vagueness grounds, we must consider whether the provision is impermissibly broad. WVFL argues in its reply brief that subsection (C) is overbroad because it reaches beyond express advocacy, and CFIF adopts this contention in its brief. *Real Truth* again controls our decision because the federal regulatory provision at issue in that case is comparable to subsection (C) of West Virginia Code section 3-8-1a(12). In *Real Truth*, this Court emphasized the Supreme Court's *Citizens United* decision, which explained that regulators need not limit disclosure requirements to "speech that is the functional equivalent of express advocacy." *Real Truth*, 681 F.3d at 551-52 (citing *Citizens United*, 130 S. Ct. at 890). Because regula-

tions may extend beyond speech that is the functional equivalent of express advocacy and subsection (C) invokes *WRTL II*'s "functional equivalent" test, subsection (C) cannot be overbroad. Therefore, CFIF and WVFL's overbreadth argument fails, and we hold that subsection (C) is constitutional.

## IV.

Next, we consider the constitutionality of the West Virginia Code's definition of "electioneering communication." Section 3-8-1a(11) defines the term as

> any paid communication made by broadcast, cable or satellite signal, or published in any newspaper, magazine or other periodical that:
>
> (i) Refers to a clearly identified candidate for Governor, Secretary of State, Attorney General, Treasurer, Auditor, Commissioner of Agriculture, Supreme Court of Appeals or the Legislature;
>
> (ii) Is publicly disseminated within:
>
>> (I) Thirty days before a primary election at which the nomination for office sought by the candidate is to be determined; or
>>
>> (II) Sixty days before a general or special election at which the office sought by the candidate is to be filled; and
>
> (iii) Is targeted to the relevant electorate.

CFIF challenges the definition's inclusion of materials "published in any newspaper, magazine or other periodical."

In *Citizens United*, the Supreme Court specified that courts should apply "exacting scrutiny" to evaluate campaign

finance disclaimer and disclosure provisions, such as the "electioneering communication" definition. 130 S. Ct. at 914. This standard requires the government to show that the statute bears a "substantial relation" to a "sufficiently important" governmental interest. *Id.* (quoting *Buckley*, 424 U.S. at 64, 66). CFIF alleges that the "electioneering communication" definition fails to survive exacting scrutiny for two reasons: (1) the government has no interest that justifies the statute's application to non-broadcast media, and (2) even if the government could demonstrate a sufficiently important interest, the legislature's failure to empirically justify the statute's application to periodicals renders it overbroad and prevents it from bearing a substantial relation to West Virginia's stated interests. As we explain below, the district court correctly agreed with CFIF's second contention, so we affirm the district court's decision to sever West Virginia Code section 3-8-1a(11)'s reference to materials "published in any newspaper, magazine or other periodical."

## *Governmental Interest*

We first address CFIF's argument that West Virginia has no sufficiently important governmental interest that justifies the statutory scheme's application to non-broadcast media. In *Buckley v. Valeo*, the Supreme Court highlighted three state interests that can justify disclosure requirements: (1) "provid[-ing] the electorate with information" about the source of campaign-related spending, (2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption," and (3) "gathering the data necessary to detect violations of . . . contribution limitations." 424 U.S. at 66-67. The second interest—preventing corruption and the appearance of corruption—does not apply to the case at hand because "electioneering communication" does not include activity by candidates or their committees. *See* W. Va. Code § 3-8-1a(11)(B)(ii). "Electioneering communication" therefore includes only materials that third parties finance, and the Supreme Court has held that third-party expenditures "do not

give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909; *see also Leake*, 525 F.3d at 292 (explaining that "independent expenditures are made without candidate consultation, rendering it unlikely that such expenditures would be made in exchange for 'improper commitments from the candidate'" (quoting *Buckley*, 424 U.S. at 47)). The third interest—gathering data to enforce more substantive electioneering restrictions—is also inapposite because states cannot limit contributions collected to fund independent electioneering communications or prohibit such communications. *See Citizens United*, 130 S. Ct. at 913. Consequently, West Virginia cannot use the second or third *Buckley* interests to justify its "electioneering communication" definition.

However, West Virginia can rely on the first interest: providing the electorate with election-related information. Requiring organizations and individuals who engage in electioneering communication to file certain reports "alert[s] the voter to the interests to which a candidate is most likely to be responsive and thus facilitate[s] predictions of future performance in office." *Buckley*, 424 U.S. at 67. Furthermore, as the Supreme Court recognized in *McConnell v. FEC*, organizations such as CFIF often have "dubious and misleading names," and "disclosure provisions require these organizations to reveal their identities so that the public is able to identify the source of the funding behind . . . advertisements influencing certain elections." 540 U.S. at 196-97. Despite CFIF's argument that the public's informational interest extends only to broadcast media, there is no reason why the public would not have a similar interest in knowing the source of campaign-related spending when it takes the form of print communication. Therefore, West Virginia can point to its interest in informing the public to justify including print media in its "electioneering communication" definition.

### Substantial Relation

Next, West Virginia must be able to demonstrate that including materials "published in any newspaper, magazine or

other periodical" in its "electioneering communication" definition bears a substantial relation to the state's interest in providing information. The district court concluded that West Virginia failed to make this showing because the state legislature neglected to make findings regarding the need to regulate non-targeted print communications, which rendered the "electioneering communication" definition fatally overbroad. *CFIF III*, 849 F. Supp. 2d at 696-97. In *Turner Broadcasting System, Inc. v. FCC*, the Supreme Court explained that, "[e]ven in the realm of First Amendment questions," legislatures "must base [their] conclusions on substantial evidence." 520 U.S. 180, 196 (1997). The *Turner* Court pointed out that courts must defer to legislative findings because legislatures are "far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Id.* at 195 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665-66 (1994)) (internal quotation marks omitted). In another opinion, the Supreme Court clarified that the "quantum of empirical evidence" required should "vary up or down with the novelty and plausibility of the justification" for the regulation. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). Because West Virginia has raised a well-accepted rationale for its electioneering communication definition—informing the electorate—its evidentiary burden falls at the bottom of this spectrum.

Nevertheless, we find that the district court correctly determined that West Virginia failed to demonstrate a substantial relation between its interest in informing the electorate and its decision to include periodicals—but not other non-broadcast materials—in its "electioneering communication" definition. However, recognizing that we may "affirm the district court on any ground that would support the judgment in favor of the party prevailing below," *Everett v. Pitt Cnty. Bd. of Educ.*, 678 F.3d 281, 291 (4th Cir. 2012) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 643 n.10 (4th Cir. 2011)) (internal quotation marks omitted), we reach our conclusion using a different logical path than the district court. The district court

based its ruling on the "conclusory" and "anecdotal" nature of the affidavits that West Virginia used to establish the need to regulate periodicals, stating that "[a]lthough several of the affidavits illustrate the *potential* of non-broadcast media as an effective electioneering tool, none of them presents anything more than anecdotal claims." *CFIF III*, 849 F. Supp. 2d at 694. However, in *Nixon v. Shrink Missouri Government PAC*, the Supreme Court credited an affidavit that noted that "large contributions have 'the real potential to buy votes'" and found that the quoted language and several newspaper articles provided sufficient justification for the campaign finance law at issue in that case. 528 U.S. at 393-94. In fact, the Supreme Court noted that the case did not even "present a close call." *Id.* at 393. In light of *Nixon*, the district court mistakenly discounted affidavits supporting the inclusion of periodicals in the "electioneering communication" definition.

When combined with other materials in the record, the affidavits discussed above provide ample support for including newspapers, magazines, and other periodicals in West Virginia's "electioneering communication" definition. The West Virginia Code specifies that the West Virginia legislature enacted the campaign finance regime to "serve[ ] a substantial governmental interest in informing the electorate." W. Va Code. § 3-8-1(a)(5). Furthermore, the statute explicitly mentions the legislature's fear that "[f]ailing to regulate non-broadcast media messages would permit those desiring to influence elections to avoid the principles and policies that are embodied in existing state law." *Id.* § 3-8-1(a)(7). The affidavits explain that including non-broadcast media—such as periodicals—in the "electioneering communication" definition addresses these concerns. David H. Gold, the president of a direct mailing company, attested that "[t]he use of direct mail and other forms of non-broadcast media is and has been increasing" and that limiting disclosure rules to broadcast media causes "entities seeking to hide the source of their funds [to] shift their expenditures into direct mail and other cost effective non-broadcast media." In fact, as Pamela M.

Van Horn—the executive director of the West Virginia Democratic Legislative Council—highlighted in her affidavit, CFIF itself shifted its spending from broadcast media to newspaper advertisements so it did not have to comply with West Virginia's reporting requirements. These affidavits clearly support the informational purpose that the West Virginia legislature enunciated in the statutory text, especially in light of our duty to defer to legislative judgments.

In addition to downplaying the relevance of these affidavits, the district court also discredited a spreadsheet that Nicholas Casey—the chairman of the West Virginia State Democratic Party—compiled and submitted. The spreadsheet details third-party spending during select 2006 and 2008 West Virginia elections. Because the spreadsheet specifies that only "a minuscule 0.4% of third-party spending" financed "print/newspaper" communications, the district court determined that (1) including periodicals in the "electioneering communication" definition did not bear a substantial relation to the state's interests and (2) the law is "severely underinclusive" because it neglects to include other, more prevalent forms of print media, such as direct mail. *CFIF III*, 849 F. Supp. 2d at 695. However, independent groups' current eschewal of periodical advertising says nothing regarding the legislature's fear that these organizations will shift from broadcast to print media to avoid the reporting and disclaimer requirements, thereby preventing the electorate from receiving valuable information about the source of campaign-related spending. Consequently, regardless of how little electioneering communication appears in periodicals, regulating this form of communication furthers the state's interest in informing the electorate.

The district court's uneasiness about the "electioneering communication" definition's underinclusivity more closely approximates our concern with that provision. We recognize the Supreme Court's admonition that "a statute is not invalid under the Constitution because it might have gone farther than

it did, . . . a legislature need not strike at all evils at the same time, and . . . reform may take one step at a time." *Buckley*, 424 U.S. at 105 (citations omitted) (internal quotation marks omitted). However, a state legislature must provide some rationale for electing to proceed one step at a time. *See Turner*, 520 U.S. at 196. Although the affidavits that West Virginia submitted sufficiently support its decision to regulate periodicals and other non-broadcast media, they do not justify the legislature's decision to regulate periodicals to the exclusion of other non-broadcast media, such as direct mailings.

We recognize that the West Virginia legislature likely eliminated direct mailings, telephone banks, and billboard advertising from its "electioneering communication" definition to comply with the district court's October 2008 decision—a decision we now see as erroneous because it found that West Virginia could not regulate non-broadcast media as a general matter. *See CFIF II*, 613 F. Supp. 2d at 800-01. However, we must "err on the side of protecting political speech rather than suppressing it," *WRTL II*, 551 U.S. at 457, and limiting the campaign finance regime's applicability to only broadcast media causes it to burden fewer election-related communications. We consequently affirm the district court's decision to strike "newspaper, magazine or other periodical" from West Virginia's "electioneering communication" definition.

V.

Next, we consider CFIF's argument that the district court erred in its decisions regarding three exemptions to West Virginia's "electioneering communication" definition. For the reasons we outline below, we find that the district court correctly upheld the definition's "grassroots lobbying" exemption and properly determined that CFIF lacked standing to challenge the "bona fide news account" exemption. However, we conclude that the district court erred in finding that the § 501(c)(3) exemption could survive constitutional scrutiny.

## A.

CFIF raises two challenges to West Virginia's "grassroots lobbying" exemption, which specifies that "electioneering communication" does not include "communication[s] made while the Legislature is in session which, incidental to promoting or opposing a specific piece of legislation pending before the legislature, urges the audience to communicate with a member or members of the Legislature concerning that piece of legislation." W. Va. Code § 3-8-1a(11)(B)(v). CFIF argues (1) that the phrase "promoting or opposing" and the word "incidental" are vague and (2) that the provision discriminates based on content and viewpoint. However, as discussed below, CFIF's contentions lack merit.

### *Vagueness Challenge*

As noted above, statutes are unconstitutionally vague when they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. CFIF relies upon this Court's decision in *North Carolina Right to Life, Inc. v. Bartlett* to support its vagueness argument. 168 F.3d 705 (4th Cir. 1999). The relevant portion of the statute at issue in *Bartlett* defined a political committee as a group whose "primary or incidental purpose . . . is to support or oppose any candidate or to influence or attempt to influence the result of an election." *Id.* at 712. The plaintiff in that case similarly argued that the provision was unconstitutionally vague, and this Court agreed. *Id.* at 713. However, differences between the circumstances at issue in *Bartlett* and the situation at hand counsel against adopting *Bartlett*'s reasoning in this case.

As the district court correctly pointed out, the North Carolina statute at issue in *Bartlett* and the statute under consideration in this case use the word "incidental" in different manners. In *Bartlett*, this Court implied that "incidental" could mean "accidental" or "unplanned" in the context of the

North Carolina statute when it explained that the word "expressly sweeps within [the statute's] ambit those groups that only *incidentally* engage in express advocacy." 168 F.3d at 712; *see also The American Heritage College Dictionary* 700 (4th ed. 2002) (defining "incidental" as "[o]ccurring or likely to occur as an unpredictable or minor accompaniment"). This reading of the statute essentially requires organizations seeking to comply with its requirements to discern when their communications unintentionally promote or oppose a candidate or accidentally influence an election, which, understandably, a person of ordinary intelligence would find difficult. By contrast, the district court properly recognized that the West Virginia statute's language—"incidental to promoting or opposing a specific piece of legislation"—clearly invokes the phrase "incident to" despite its inapt use of the word "incidental." *CFIF III*, 849 F. Supp. 2d at 701. *Black's Law Dictionary* defines "incident" as "[d]ependent upon, subordinate to, arising out of, or otherwise connected with." *Black's Law Dictionary* 830 (9th ed. 2009). In light of the wording of West Virginia's statute, it is clear that the legislature intended this meaning rather than the definition that this Court held to be vague in *Bartlett*. Consequently, the exemption's incorporation of the word "incidental" does not prevent a person of ordinary intelligence from understanding its import.

Next, CFIF alleges that the phrase "promoting or opposing" is impermissibly vague because it "turn[s] on the speaker's perceived intent" and requires speculation regarding the "potential effect of the speech on listeners." To support its argument, CFIF relies on *Buckley v. Valeo*, which held that the D.C. Circuit failed to cure an election statute's vagueness when that circuit construed the statute to apply only to speech "advocating the election or defeat of" a candidate. 424 U.S. at 42-43. In *Buckley*, the Supreme Court determined that the D.C. Circuit's clarification remained vague because it constituted an impermissible "intent-and-effect" test that put speakers "at the mercy of the varied understanding of [their] hearers

and consequently of whatever inference may be drawn as to [their] intent and meaning." *Id.*

The district court countered CFIF's argument by citing footnote 64 of *McConnell v. FEC*, which explicitly held that the words "promote" and "oppose" were not unconstitutionally vague. 540 U.S. at 170 n.64. In *McConnell*, the Supreme Court held that campaign finance statutes featuring the words "promote" and "oppose" "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* Although the Court recognized that "[t]his is particularly the case here, since actions taken by political parties are presumed to be in connection with election campaigns," it did not limit its holding to situations involving political parties. *Id.*

Despite CFIF's arguments that this Court's decision in *Leake* "flatly rejected the notion that footnote 64 in *McConnell* applies to speech beyond that by political parties," *Leake* merely held that a statutory scheme incorporating the phrase "support or oppose" was unconstitutionally vague due to additional language that does not appear in West Virginia's statute. 525 F.3d at 280-81, 285-86 (concluding that the statute was vague because it "determine[d] whether speech [was] regulable based on how a 'reasonable person' interpret[ed] the speech's 'essential nature' in light of four 'contextual factors'"). Additionally, *WRTL II* does not require us to strike down the exemption because—contrary to CFIF's assertions—that case has no effect on *McConnell*'s conclusion regarding "promote and oppose"; *WRTL II* simply reiterated that intent-and-effect tests were impermissible while passing no judgment regarding *McConnell*'s vagueness holding. 551 U.S. at 465. Consequently, pursuant to *McConnell*, the words "promote" and "oppose" do not render the grassroots lobbying exemption vague, allowing the exemption to survive CFIF's vagueness challenge.[5]

---

[5]CFIF also argues that the phrase "urges the audience" is vague in its reply brief. However, in its renewed motion for summary judgment, CFIF

*Content and Viewpoint Discrimination Challenge*

In addition to arguing that the grassroots lobbying exemption is impermissibly vague, CFIF contends that the provision unconstitutionally discriminates based on communications' content and viewpoint. In particular, CFIF points out that the provision (1) exempts speech that occurs while the legislature is in session but burdens speech that takes place at other times, (2) exempts communications that concern specific, pending legislation but burdens speech regarding other legislation, (3) exempts speech urging contact with legislators but burdens communications that encourage reaching out to non-incumbents or executive branch officials, and (4) exempts communications that support or oppose legislation but burdens speech that requests other action, such as recommending that a nominee be confirmed. Although the Supreme Court typically applies strict scrutiny to content-based speech restrictions, *see Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011), disclosure and disclaimer requirements are subject to exacting scrutiny. *Citizens United*, 130 S. Ct. at 914. Therefore, the grassroots lobbying exemption is constitutionally permissible if, in its absence, the "electioneering communication" definition would not bear a "substantial relation" to a "sufficiently important" governmental interest. *Id.* For the reasons we outline below, the exemption survives exacting scrutiny.

As explained above, the only sufficiently important interest at stake in this case is informing the electorate about the source of campaign-related spending. Thus, the "electioneering communication" definition must bear a substantial relation

---

failed to raise this vagueness challenge, and the district court did not address it. We therefore decline to discuss this argument. *See Lovelace v. Lee*, 472 F.3d 174, 202 n.10 (4th Cir. 2006); *see also* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2716 (3d ed. 1998) (explaining that a party appealing a denial of its motion for summary judgment cannot "advance new theories or raise new issues in order to secure a reversal of the lower court's determination").

to that interest to withstand exacting scrutiny; in other words, we will uphold the grassroots lobbying exemption if the communications that it encompasses do not bear a substantial relation to providing the public with information. The district court reasoned that communications that relate to pending legislation and take place while the legislature is in session are more likely to be true issue advocacy—the regulation of which the Supreme Court has been loath to endorse—rather than express advocacy masquerading as issue advocacy. *WRTL II*, 551 U.S. at 455-57; *CFIF III*, 849 F. Supp. 2d at 703. The court therefore held that the exemption was necessary because the statutory scheme "imposes reporting requirements on communications more likely to be 'sham issue ads' and because the exemption spares from reporting requirements those communications least likely to be 'sham issue ads.'" *Id.*

Although West Virginia offers weak evidentiary support for its argument that the legislature crafted this exemption to avoid burdening pure issue advocacy, considering the type of speech the legislature chose to exempt makes the legislature's aim abundantly clear. Furthermore, the statute itself recognizes the importance of distinguishing issue advocacy from express advocacy by explaining that "[d]isclosure by persons and entities that make expenditures for communications that expressly advocate the election or defeat of clearly identified candidates" is a "reasonable and minimally restrictive method of furthering First Amendment values by public exposure." W. Va. Code § 3-8-1(a)(6). In all likelihood, if West Virginia had not included this exemption, CFIF would have challenged the regulatory scheme as overbroad due to its applicability to issue advocacy. Therefore, the district court correctly found that the grassroots lobbying exemption allows the "electioneering communication" definition to survive exacting scrutiny, and the exemption does not impermissibly discriminate on the basis of communications' content and viewpoint.

## B.

Next, CFIF alleges that the statute's exemption for news accounts is unconstitutionally vague due to its inclusion of the phrase "bona fide news account." Under the exemption, "bona fide news account[s]" that a speaker "disseminate[s] through a medium owned or controlled by a political party, political committee or candidate" are not electioneering communications. W. Va. § 3-8-1a(11)(B)(i). The district court held that CFIF lacked standing to challenge this provision because CFIF (1) does not publish or intend to publish news stories and (2) does not function as a political party, political committee, or candidate. *CFIF III*, 849 F. Supp. 2d at 706-07. Although CFIF correctly points out that it need not be a political party, political committee, or candidate to disseminate a news story through a medium that such an entity owns or controls, it has never averred that it has published a news story through one of these media outlets or that it plans to do so. Furthermore, contrary to CFIF's assertions, the fact that CFIF is "an entity subject to West Virginia's campaign finance laws" does not give it carte blanche to challenge laws that are inapplicable to its activities. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 797 (1984) (explaining that the doctrine allowing facial challenges to overbroad statutes "did not create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court"). Therefore, the district court properly held that CFIF lacks standing to challenge the "bona fide news account" exemption.

## C.

Finally, CFIF contends that the statute's exemption for "communication[s] paid for by any organization operating under § 501(c)(3) of the Internal Revenue Code" unconstitutionally discriminates against § 501(c)(4) organizations such as CFIF. W. Va. Code § 3-8-1a(11)(B)(iv). Once again, we apply exacting scrutiny to determine if the exemption is con-

stitutionally permissible, *Citizens United*, 130 S. Ct. at 914, and, as explained above, the only sufficiently important governmental interest at stake in this case is providing the electorate with information about the source of campaign-related spending. Consequently, because we are evaluating an exemption to the campaign finance regime, West Virginia must demonstrate that regulating communications that fall within the exemption does not bear a substantial relation to this governmental interest. For the reasons we outline below, West Virginia has failed to make this showing.

The Internal Revenue Code prohibits § 501(c)(3) organizations from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). As noted above, West Virginia exempts these organizations from complying with reporting and disclaimer requirements that other organizations engaging in electioneering communication must satisfy. West Virginia's § 501(c)(3) exemption is identical to a since-repealed regulatory provision that the FEC promulgated to enforce the BCRA. 11 C.F.R. § 100.29(c)(6) (repealed Jan. 19, 2006). In light the fact that the Internal Revenue Code prohibits § 501(c)(3) organizations from engaging in express advocacy, the FEC noted that commentators had concluded that the "'BCRA's application to 501(c)(3)s [would] prohibit[ ] activity that is already forbidden,' and the activities the Internal Revenue Service permits 501(c)(3) organizations to engage in are activities 'that BCRA was not intended to reach.'" 67 Fed. Reg. 65,190-01, 65,199 (Oct. 23, 2002) (alteration in original). The district court relied on this logic when upholding the West Virginia exemption. *See CFIF III*, 849 F. Supp. 2d at 707-08.

However, the district court erred in finding that the § 501(c)(3) exemption could withstand exacting scrutiny for at least two reasons. First, exemptions such as the one at issue in this case assume that campaign finance laws and

§ 501(c)(3) are coextensive in terms of the electioneering communication that they prohibit, which may not be the case. *See Shays v. FEC*, 337 F. Supp. 2d 28, 126-28 (D.D.C. 2004). Therefore, by exempting communications by § 501(c)(3) organizations from the definition of "electioneering communication," West Virginia likely deprived the electorate of information about these organizations' election-related activities. Second, the district court recognized that "the West Virginia Legislature has not set forth comprehensive findings for enacting such an exemption" and implied that the legislature must have relied on the logic behind the defunct FEC regulation. *See CFIF III*, 849 F. Supp. 2d at 708. The FEC rescinded this regulation in 2006 after a district court held that the exception lacked "reasoned analysis" to support it. *See Shays*, 337 F. Supp. 2d at 127-28. As discussed in detail above, legislatures must base their conclusions on substantial evidence. *See Turner*, 520 U.S. at 196. In light of the federal regulation's history and the lack of other support for the exemption, we are unable to find that the "electioneering communication" definition bears a substantial relation to the government's interest in informing the electorate with the § 501(c)(3) exemption in place.

CFIF contends that, if any of the exemptions is constitutionally impermissible, we must invalidate the entire regulatory scheme affecting electioneering communications because striking the exemption would burden more speech than the legislature intended to restrict. Although CFIF correctly suggests that "when a section of a statute is declared void, the statute cannot be given effect as though the legislature had not enacted the conditions limiting its operation," *Quinn v. Comm'r*, 524 F.2d 617, 626 (7th Cir. 1975), this drastic remedy is unnecessary in this case. In *McCorkle v. United States*, this Court explained that, "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." 559 F.2d 1258, 1261 (4th Cir. 1977). It is hard to

believe that West Virginia would have foregone regulating electioneering communications if it had to subject § 501(c)(3) organizations to the statutory requirements. We therefore invalidate the § 501(c)(3) exemption while leaving the rest of the "electioneering communication" definition intact.

## VI.

In addition to challenging the definitional portions of West Virginia's campaign finance laws, CFIF also challenges one of the statutory scheme's substantive requirements. In relevant part, the West Virginia Code requires individuals who engage in electioneering communication to comply with the following reporting requirements:

1.  Every person who spends a total of $5,000 or more during any calendar year on electioneering communication must file reports with West Virginia's secretary of state within twenty-four hours of the "disclosure date," which is the date when the individual spends $5,000 on electioneering communication in a calendar year. Individuals must file these reports each time they spend $5,000. W. Va. Code §§ 3-8-1a(9), 3-8-2b(a)(1).

2.  Every person who spends a total of $1,000 or more during the two weeks immediately preceding an election must file a report with West Virginia's secretary of state. Individuals must file these reports within twenty-four hours of the "disclosure date," which West Virginia defines in the same manner for both electioneering communication reporting requirements. *Id.* §§ 3-8-1a(9), 3-8-2b(a)(2).

West Virginia also requires electioneering communications to feature certain disclaimers. The disclaimers must (1) clearly indicate that a candidate or candidate's committee did not authorize the communication and (2) clearly identify the person making the expenditure. *Id.* § 3-8-2b(e). CFIF's challenge

focuses on the reporting requirements for electioneering communications rather than the disclaimer requirements.

CFIF specifically contends that West Virginia Code section 3-8-2b(b)(5) is ambiguous. That provision mandates disclosure of the "names and addresses of any contributors who contributed a total of more than one thousand dollars between the first day of the preceding calendar year and the disclosure date whose contributions were used to pay for electioneering communications" but provides no clear guide for determining when an organization "used" a contribution "to pay for electioneering communications." *See* W. Va. Code § 3-8-2b(b)(5). In light of this alleged ambiguity, CFIF argues that the provision requires cautious organizations to disclose the names and addresses of all contributors who donate more than $1,000 within the applicable timeframe, even when they contributed to the organization's general treasury. CFIF then maintains that requiring organizations to file reports regarding their general treasury contributions does not serve West Virginia's interest in informing the electorate, precluding the reporting requirement from surviving exacting scrutiny. West Virginia, in turn, asserts that section 3-8-2b(b)(5) is not ambiguous and that the provision can survive exacting scrutiny even if we accept CFIF's broad interpretation.

Like all campaign finance-related disclosure requirements, West Virginia Code section 3-8-2b(b)(5) is subject to exacting scrutiny. *Citizens United*, 130 S. Ct. at 914. As previously noted, this standard requires regulatory provisions to bear a "substantial relation" to a "sufficiently important" governmental interest. *Id.* (quoting *Buckley*, 424 U.S. at 64, 66). For the reasons we outline above, the only governmental interest at stake in this case is West Virginia's interest in providing the electorate with information about the source of campaign-related spending. Consequently, West Virginia Code section 3-8-2b(b)(5) must bear a substantial relation to this interest to pass constitutional muster.

The district court agreed with CFIF's contention that West Virginia code section 3-8-2b(b)(5)'s ambiguity prevented it from surviving exacting scrutiny. The court determined that compelling expansive disclosure of treasury contributions would result in a "flood of information" about donors who may not have directly financed electioneering communications. The court reasoned that, rather than furthering West Virginia's interest in informing the electorate, providing information about corporate treasury donations could hinder West Virginia's goal by inundating the public with marginally relevant information. The district court also feared that a broad disclosure requirement would be so administratively onerous for organizations such as CFIF that it would discourage them from speaking at all. To avoid overwhelming the public with information and unduly burdening groups who engage in electioneering communication, the district court restricted the reporting requirement to contributions from "individuals who respond to a solicitation for electioneering communications or earmark their contributions for such use," a solution that it drew from an FEC regulation. *CFIF III*, 849 F. Supp. 2d at 717-19 (citing 72 Fed. Reg. 72,899, 72,910 (Dec. 26, 2007)). As discussed below, we find that the court erred in determining that West Virginia code section 3-8-2b(b)(5) could not survive exacting scrutiny and in circumscribing its scope via the "earmarked funds" limiting construction.

To combat CFIF's argument that West Virginia code section 3-8-2b(b)(5) is unconstitutional, West Virginia points to *McConnell*, in which the Supreme Court upheld a similar statute that imposed reporting requirements on "[e]very person who makes a disbursement for the direct costs of producing and airing electioneering communications." 2 U.S.C. § 434(f)(1); *McConnell*, 540 U.S. at 196. Specifically, the *McConnell* Court found that the state interests that *Buckley* enumerated—including providing the public with information—"amply support[ed]" imposing reporting requirements on organizations that engaged in electioneering communica-

tion. *McConnell*, 540 U.S. at 196. As the below analysis illustrates, we find that *McConnell* controls this case and necessitates reversing the district court's conclusion that West Virginia's electioneering communication reporting requirements cannot survive exacting scrutiny.

At the time the Supreme Court decided *McConnell*, the BCRA barred corporations from using general treasury funds to finance electioneering communications and required them to establish a "separate segregated fund" for such expenditures. 2 U.S.C. § 441b(b)(2), *invalidated by Citizens United*, 130 S. Ct. 876; *McConnell*, 540 U.S. at 195 & n.79. Consequently, when the Supreme Court decided *McConnell*, § 434(f)(1) could not suffer from the same purported ambiguity that allegedly prevents West Virginia Code section 3-8-2b(b)(5) from surviving exacting scrutiny, even though average individuals could just as easily interpret § 434(f)(1) to encompass general treasury donations absent the "separate segregated fund" requirement. However, in *Citizens United*, the Supreme Court ruled that federal law's ban on using corporate treasury funds to engage in express advocacy was unconstitutional while simultaneously approving of *McConnell*'s conclusion that 2 U.S.C. § 434(f)(1) was facially valid. *See Citizens United*, 130 S. Ct. at 913-14. *Citizens United* therefore demonstrates that the Supreme Court's conclusion regarding § 434(f)(1)'s constitutionality was not tied to the prohibition regarding corporate treasury funds. Accordingly, even if we assume for the sake of argument that section 3-8-2b(b)(5) is ambiguous, *McConnell* compels us to find that the provision is constitutional. We therefore reverse the district court's conclusion that section 3-8-2b(b)(5) cannot survive exacting scrutiny and its decision to impose an "earmarked funds" limiting construction to cure the provision's alleged unconstitutionality.

## VII.

Like CFIF, WVFL also raises certain challenges to the statutory scheme's substantive requirements. Specifically, WVFL contends in its reply brief that the electioneering communication reporting and disclaimer requirements described above and the similar reporting and disclaimer requirements for groups that make independent expenditures[6] are "patently unreasonable" and "severely burden First Amendment rights." However, we cannot consider this issue because WVFL did not file an appeal in this case. *See* Fed. R. App. P. 4(a)(3); *Thurston v. United States*, 810 F.2d 438, 447 (4th Cir. 1987). The district court's conclusion that the reporting and disclaimer requirements are constitutional therefore remains undisturbed. *See CFIF III*, 849 F. Supp. 2d at 711-15.

---

[6]Organizations that make independent expenditures must comply with the following requirements:

1. A person who makes independent expenditures totaling more than $1,000 during a calendar year must file a report with West Virginia's secretary of state. W. Va. Code § 3-8-2(b)(1).

2. Any person who makes or contracts to make independent expenditures aggregating $10,000 or more at any time before an election must file a report with West Virginia's secretary of state within forty-eight hours. *Id.* § 3-8-2(d)(1). Thereafter, the person must file an additional report for each aggregate $10,000 he or she spends within forty-eight hours of the expenditure. *Id.* § 3-8-2(d)(2).

3. Any person who makes or contracts to make independent expenditures within the two weeks before an election aggregating either $1,000 (for multi-county or statewide elections) or $500 (for single-county or municipal elections) must file a report describing the expenditure with West Virginia's secretary of state within twenty-four hours. *Id.* § 3-8-2(c)(1). The person must file an additional report for each aggregate $1,000 or $500 he or she spends within twenty-four hours of the expenditure. *Id.* § 3-8-2(c)(2).

Finally, West Virginia imposes the same disclaimer requirements on both independent expenditures and electioneering communications. As noted above, these disclaimers must (1) clearly indicate that a candidate or candidate's committee did not authorize the communication and (2) clearly identify the person making the expenditure. *Id.* §§ 3-8-2(e), 3-8-2b(e).

VIII.

Finally, West Virginia contends that the district court should have vacated as moot its earlier injunctions because West Virginia had repealed the statutory provisions that were subject to the injunctions. Instead of vacating the injunctions, the court reiterated the decision it made when it dissolved the April 2008 injunction: "'dissolution of this court's preliminary injunction order . . . does not mean that either the new or old versions of West Virginia's Election Code may be applied to violations that are alleged to have occurred prior to' the date of dissolution." *CFIF III*, 849 F. Supp. 2d at 719-20 (alteration in original) (quoting *Ctr. for Individual Freedom, Inc. v. Ireland*, No. 1:08-00190, 2008 WL 4452659, at *2 n.2 (S.D. W. Va. Sept. 29, 2008)). Hence, under the district court's ruling, West Virginia cannot punish offenders for violating the provisions that were subject to the injunctions while the injunctions were in effect.

Under West Virginia law, the state can enforce a repealed law after the repeal becomes effective as long as the offense occurred while the statute was in effect. W. Va. Code § 2-2-8. Therefore, if we vacate the injunctions as moot, West Virginia will have the power to punish organizations for earlier violations of the statute. In *Jacobus v. Alaska*, on which CFIF relies, the Ninth Circuit explained that, "[d]espite superseding events, an issue is not moot if there are present effects that are legally significant." 338 F.3d 1095, 1104 (9th Cir. 2003). The Ninth Circuit found that the plaintiffs' claims were not moot because the state was "likely" to prosecute, citing a letter from the relevant regulatory body reserving the right to prosecute past violations. *Jacobus*, 338 F.3d at 1104.

In this case, West Virginia's secretary of state attested that her "office will not seek to enforce those provisions of said Articles that have been repealed." CFIF relies primarily on a statement that another official made during a radio broadcast in 2008 and an election law complaint that West Virginia's

attorney general filed over three years ago to support its argument. We admit that this evidence does not overwhelmingly demonstrate that the repealed provisions remain "legally significant," especially in light of the secretary of state's affidavit. However, as discussed above, we review the district court's decision regarding the preliminary injunction for abuse of discretion. *See Conservation Council of N.C.*, 528 F.2d at 251-52. Despite the weakness of the evidence in favor of CFIF's argument, we decline to go so far as to find that the district court abused its discretion when it decided to dissolve the injunctions rather than vacating them as moot. We therefore affirm the district court's decision to prohibit West Virginia from prosecuting individuals who violated the enjoined campaign finance provisions while the injunctions were in effect.

## IX.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*